## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **218 7th STREET SE LLC**<br>218 7th Street SE,<br>Washington, D.C. 20003<br><br>*Plaintiff*<br><br>v.<br><br>**SCHOOL OF SMIZE LLC**<br>10960 Wilshire Blvd., 5th Floor<br>Los Angeles, CA 90024<br><br>**TYRA BANKS**<br>10960 Wilshire Blvd., 5th Floor<br>Los Angeles, CA 90024<br><br>**LOUIS MARTIN**<br>10960 Wilshire Blvd., 5th Floor<br>Los Angeles, CA 90024<br><br>*Defendants* | Civil Case. No. 1:25-cv-3625 |

## COMPLAINT

1.      Plaintiff 218 7th Street SE LLC, by and through its undersigned counsel, brings this action against Defendants School of Smize LLC, Tyra Banks, and Louis Martin, for breach of contract, anticipatory repudiation, breach of the implied duty of good faith and fair dealing, unjust enrichment, to pierce the corporate veil and impose alter ego liability against Tyra Banks and Louis Martin, and declaratory judgment.

## INTRODUCTION

2.      In June 2025, Christopher Powell watched a TikTok video of Tyra Banks unveiling her newest business, an ice cream shop called Smize & Dream.[1] Beginning in March 2024, Mr.

---

[1] "Smize" is a term Defendant Banks famously coined meaning "to smile with your eyes."

Powell worked with Ms. Banks and her partner, Louis Martin, on opening Smize & Dream on the lower floors of a building Mr. Powell owns in the Eastern Market neighborhood of the District.

3. When they met in March 2024, Ms. Banks told Mr. Powell she sought to open Smize & Dream as a tribute to her mother, because in her youth they would share ice cream and discuss their dreams. She said Smize & Dream would not only be an ice cream shop, but also an initiative to provide underserved youth in Washington with education in science, sales, and hospitality. Ms. Banks told Mr. Powell that the D.C. location in his building would be the flagship location of what Ms. Banks envisioned as a global chain serving communities around the world.

4. Ms. Banks's story and mission moved Mr. Powell. In his childhood, Mr. Powell helped his own mother sell jewelry for extra money at a market just a few blocks from his building, and he bought the property to invest in a business that would serve his community. Additionally, Ms. Banks's repeated assurances that she would leverage her business acumen and celebrity status to make Smize & Dream a success helped convince Mr. Powell to work with her and Mr. Martin.

5. Ms. Banks and Mr. Martin subsequently visited the property several times, and ultimately agreed to take the premises as-is. On April 17, 2024, Mr. Martin, on behalf of Smize & Dream, and Mr. Powell, on behalf of his company, entered into a ten-year commercial lease.

6. Mr. Powell then began collaborating with Ms. Banks and Mr. Martin on Smize & Dream, meeting with architects and designers, receiving various machines and supplies at his building, and spending thousands of dollars to meet Ms. Banks's specifications.

7. But as Mr. Powell watched the video of Ms. Banks showcasing the designs and construction they had agreed upon for Smize & Dream, he was not looking at his property. Instead, Ms. Banks was opening Smize & Dream across the world, in Sydney, Australia. After declining alternative tenants, dedicating months of planning, and undertaking extensive financial

investment, Mr. Powell was sustaining increasing monetary losses because Ms. Banks and Mr. Martin abruptly abandoned the premises in June 2024 and were refusing to pay rent. Mr. Powell had no indication that Ms. Banks and Mr. Martin would desert the venture, since they had repeatedly conveyed their dedication to opening Smize & Dream in his building.

8.      In June 2024, when Ms. Banks and Mr. Martin first notified Mr. Powell that they were abandoning the venture, they offered no explanation. But just a few weeks after they abandoned his building, Mr. Powell was watching the news and saw then-Vice President Kamala Harris eating ice cream with Ms. Banks at a Smize & Dream pop-up shop[2] Ms. Banks had opened in Woodley Park,[3] just miles from Mr. Powell's building. While Mr. Powell scrambled to address the legal and financial fallout from their abandonment, Ms. Banks and Mr. Martin had already launched an alternative Smize and Dream venture elsewhere while ignoring their legal obligations.

9.      Considering his substantial investment, Mr. Powell tried to reach an amicable resolution with Ms. Banks and Mr. Martin. Then, in September 2024, months after they executed the lease and then suddenly abandoned the project, Ms. Banks and Mr. Martin sent Mr. Powell a letter purporting to explain their unexpected breach of the lease. To Mr. Powell's surprise, Ms. Banks and Mr. Martin lodged numerous false accusations against Mr. Powell, his building, and the lease. They made claims of deficiency in the property that are both untrue and irrelevant, and threatened to publicize their lies if Mr. Powell filed a lawsuit against them.

---

[2]   "'Pop-ups' are short-term retail leases or temporary tenancy agreements." GLENN D. WRIGHT & ROBIN ABRAMS, *The Evolution of the "Pop-Up"*, 37 PROB. & PROP. 40, 41 (May/June 2023). Traditionally known for seasonal occasions such as Christmas or Halloween, pop-ups have grown in popularity as online sales have surpassed in-store retail sales. *Id.* at 40–42.
[3]   SOPHIA SOLANO, *Why Is Tyra Banks Serving Ice Cream in D.C.? Here's the Scoop.*, WASH. POST (July 19, 2024), https://www.washingtonpost.com/dc-md-va/2024/07/19/tyra-banks-ice-cream-shop-smize-dream-dc/.

10.     Ms. Banks and Mr. Martin further claimed they were justified in abandoning the premises because they were promised the entire building, an outrageous and easily disprovable lie.

11.     Ms. Banks and Mr. Martin also stated that even if Mr. Powell filed a lawsuit and secured a ruling against them, they would not pay any judgment. Instead, they would avoid liability by shifting blame onto their company that they claim has no assets.

12.     Ms. Banks and Mr. Martin entered the lease agreement fully aware of all material terms, including that the lease applied only to a portion of the building and they were accepting the property as-is. Upon information and belief, they later decided to abandon the ten-year lease for reasons unrelated to Mr. Powell or his property. Ms. Banks instead decided to test the D.C. market with the pop-up shop in Woodley Park[4], which closed in October 2024. Realizing they had no legal basis for abandoning Mr. Powell's property, they fabricated grievances to justify their breach. Then, Ms. Banks weaponized her celebrity influence to deter Mr. Powell from filing suit, his only remaining means to secure his rightful payment. Finally, Ms. Banks and Mr. Martin deflected personal liability onto their company to avoid paying their debts. They ultimately opened Smize & Dream in Australia, where they relocated with Ms. Banks's child. Although Mr. Powell made repeated good faith efforts to resolve this matter amicably, he is now left with deep financial loss and no choice but to file suit.

13.     This action seeks to hold Ms. Banks and Mr. Martin responsible for contracting in the District at the expense of Mr. Powell, repudiating their obligations in bad faith, and weaponizing the corporate veil and their public influence to evade their legal and financial responsibilities.

---

[4] "Pop-ups are a valuable way for a retailer to assess the demand for their products and concepts, with minimal risk." WRIGHT & ABRAMS, *supra* note 2, at 41.

**PARTIES**

14.     Plaintiff 218 7th ST SE LLC ("Landlord") is a limited liability company organized under the laws of the District of Columbia.

15.     Defendant School of Smize LLC (or "Defendant Tenant") is a limited liability company organized under the laws of the State of Delaware.

16.     Tyra Banks ("Defendant Banks"), upon information and belief, is a member of Defendant School of Smize LLC. At minimum, Defendant Banks serves as an authorized signatory for Defendant School of Smize, exercises decision-making authority on the company's behalf, and acts as its agent in the matters described herein.

17.     Louis Martin ("Defendant Martin"), upon information and belief, is a member of School of Smize LLC. At minimum, Defendant Martin serves as an authorized signatory for School of Smize, exercises decision-making authority on the company's behalf, and acts as its agent in the matters described herein.

18.     Defendant Tenant, Defendant Banks, and Defendant Martin are referred to herein collectively as "Defendants."

19.     Defendant Banks and Defendant Martin are referred to herein collectively as "Defendants Banks and Martin."

20.     Landlord, Defendant Tenant, Defendant Banks, and Defendant Martin are referred to herein collectively as "the Parties."

**JURISDICTION AND VENUE**

21.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (2018) because there is complete diversity of citizenship between Plaintiff and all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

22.    This Court has supplemental jurisdiction over the District of Columbia law claims under 28 U.S.C. § 1367(a) (2018).

23.    This Court has personal jurisdiction over Defendant Tenant, Defendant Banks, and Defendant Martin under D.C. Code § 13-423(a)(1), (5) (2022) because they transacted business in the District, used real property that is the subject of this suit, and the claims arise from their conduct in the District.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) (2018) because a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia and the property that is the subject of this action is located here.

**STATEMENT OF FACTS**

25.    Christopher Powell is a D.C.-based entrepreneur and landlord. Mr. Powell owns the building located at 218 7th Street SE within the Eastern Market neighborhood of Washington, D.C. ("the Building"). The Building consists of five levels: (1) an underground cellar at the basement level; (2) a retail level encompassing the entire first floor; (3) a second floor comprised of offices and residential units; and (4) two duplex apartments on the third and fourth floors. All leases for the Building are executed by Landlord. Mr. Powell is authorized to act on Landlord's behalf.

26.    In 2024, Mr. Powell posted an advertisement for available space in the Building on an online commercial real estate platform. The advertisement described and pictured the available space for rent in the Building: the cellar floor, the retail level, and the two second-floor mixed-use units ("the Premises").

27.    On February 29, 2024, Defendant Martin contacted Mr. Powell via text message stating he had seen the advertisement and requesting a tour of the property. In the initial messages between Mr. Powell and Defendant Martin, Defendant Martin asked, "Is the full building available

to rent?" Mr. Powell responded, "There are two apartments that are currently rented. Everything else is available. Two retail spaces and two office spaces." Defendant Martin responded, "Ok. We are interested in seeing these available spaces." (Text Message Exchange Between Christopher Powell and Louis Martin Regarding 218 7th St. SE, Ex. A, Feb. 29, 2024).

28.    On March 1, 2024, at 9 a.m., Mr. Powell met Defendant Banks and Martin at the Building and gave them a tour of the Premises. Mr. Powell reiterated that the entire building was not available for rent, and Defendants Banks and Martin also personally observed the same. Defendants expressed strong interest in leasing the Premises and asked to meet with Mr. Powell again later the same day.

29.    Defendants returned at 1 p.m. with their broker. Defendant Banks explained she wanted to open an ice cream shop to honor her mother, because in her childhood her mother took her to get ice cream on Friday nights. She said the shop would be called Smize & Dream, and would also serve as a launchpad for teaching underprivileged local youth the science of ice cream and the business of selling it. The D.C. location of Smize & Dream would be the first and flagship location of what Ms. Banks envisioned as a global chain. She planned to designate a meeting room on the second floor for hosting prospective franchisees and their training sessions.

30.    The Parties discussed numerous key provisions of the Lease, including but not limited to: the scope of the Premises; the Lease term; rent and other fees; buildout responsibilities under the Lease; and Defendants' improvement plans. After speaking for several hours, the Parties agreed to enter a ten-year commercial lease for Smize & Dream. Over the next six weeks, Defendants Banks and Martin personally visited the Premises on no fewer than ten occasions and never requested access to the remainder of the Building.

31.     On April 17, 2024, Defendant Martin and Mr. Powell executed the ten-year Lease ("the Lease") on behalf of Defendant Tenant and Landlord, respectively. A true and correct copy of the Lease is attached hereto as Exhibit B and incorporated herein by reference.

32.     The Lease describes the Premises as "shown on Exhibit A, being the real property in the District of Columbia referred to as 218 7th Street SE, Washington, DC 20003, including the land and all improvements located thereon." (Lease § 2.1, Ex. B at 3). The Parties never attached an Exhibit to the Lease depicting the Premises. Nonetheless, the Parties understood the Lease to include only what was advertised, the only space Defendants Banks and Martin toured, and the only portion of the Building being accessed and renovated by Defendants: the Premises.

33.     The Lease provides "Landlord shall deliver the Premises in its 'As-Is' condition." (Lease art. VI, Ex. B at 7); therefore Landlord had no obligation to make any changes to the Premises other than those specifically detailed in the Lease,[5] and made no representations or promises about the suitability of the Premises for Defendants' intended use. (Lease § 22.20, Ex. B at 36).

34.     Upon execution of the Lease, Defendants immediately took possession of the Premises, utilizing it for meetings, deliveries, and site visits from their various personnel. With Defendants' full knowledge, Landlord made preparations for Smize & Dream. Defendants Banks and Martin put Landlord in contact with their architects and designers, who frequently corresponded with Landlord regarding the Premises.

---

[5] "Landlord shall deliver the Premises in its "As-Is" condition, with all existing mechanical, electrical, and plumbing systems in good working order, a minimum of 400 amps electrical service and a water line and drain stubbed to the rear of the first floor," and ensure the second-floor units and bathroom are delivered as-is and ready for finishes. (Lease art. VI, Ex. B, at 7).

35.     The Parties regularly communicated and collaborated regarding Smize & Dream. Defendants Banks and Martin never expressed concern about the Premises, nor indicated that they wanted to take possession of any part of the Building other than the Premises.

36.     Then on June 25, 2024, months after executing the Lease, occupying the Premises, and planning the buildout specifications, Defendants' counsel suddenly sent Landlord a letter stating that Defendants had vacated the Premises and would terminate the Lease on June 30, 2024. Defendants also stated they were willing to offer their $60,000 security deposit ("the Security Deposit") as full consideration for termination of the Lease.

37.     The letter gave no explanation for Defendants' sudden decision to breach the Lease. Under the Lease, Defendants could only terminate the Lease under narrow circumstances, none of which apply in this case.[6]

38.     On June 28, 2024, Landlord responded by letter refusing Defendants' offer to apply the Security Deposit as full consideration for termination of the Lease and advising Defendants that the Lease remained in effect. But just two weeks later, on July 11, news outlets reported Ms. Banks was instead opening a Smize & Dream pop-up shop on Connecticut Avenue in the Woodley Park neighborhood of D.C.[7]

39.     In early August, counsel for the Parties conferred by telephone to discuss the Lease. Defendants again refused to fulfill their obligations under the Lease and offered the Security

---

[6] Under the Lease, Tenant may elect to terminate if a Restoration Notice shows repairs will exceed the Lease's time limit after a casualty or if restoration is not feasible or Landlord fails to provide a timely restoration estimate. The Lease also terminates automatically for any portion condemned. (Lease § 16.1, Ex. B at 20; § 16.3, Ex. B at 20–21; § 17.1, Ex. B at 21).

[7] IKE ALLEN, *Tyra Banks Is Opening an Ice Cream Pop-Up in Woodley Park*, WASHINGTONIAN (July 11, 2024), https://www.washingtonian.com/2024/07/11/tyra-banks-is-opening-an-ice-cream-pop-up-in-woodley-park/.

Deposit as consideration for termination of the Lease. Landlord declined the offer. On August 14, 2024, Landlord again notified Defendants of their continued obligations under the Lease.

40.     Then on September 9, 2024, Defendants sent Landlord a letter and, for the first time, claimed that Landlord materially breached the Lease by not delivering the entire building to Defendants, an outrageous and demonstrably false allegation.

41.     During their very first conversation, Mr. Powell informed Mr. Martin that the entire building was not available for rent. The initial showing only included the Premises. Defendants' architectural and interior design teams were only working on the bottom three levels of the Building.[8] Ms. Banks and Mr. Martin both knew there were residential tenants in the building with no plans to leave. In fact, Ms. Banks and Mr. Martin met with one of these tenants on numerous occasions, a woman who has lived in the building for over 20 years and unmistakably communicated that she has no plans to move.[9] In reality, Ms. Banks and Mr. Martin were manipulating language in the Lease to fraudulently claim Mr. Powell promised them the entire Building, despite voluminous evidence proving otherwise, to fabricate a pretext for their breach.

42.     Defendants also presented allegations of deficiencies in the Premises for the first time in the five months since executing the Lease. Even if the alleged deficiencies existed in the Premises, they are irrelevant under the Lease.[10]

_____

[8] Pursuant to the terms of the Lease, Defendants created plans for only the three levels comprising the Premises, not the entire Building. Ex. C (MEP Zoning Plan for 218 7th Street SE, prepared by Michael Graves (May 24, 2024)); Ex. D (Floor Plans for 218 7th Street SE, prepared by Demian Wilbur Architects).

[9] The tenant, Adele Sheehan, met with Ms. Banks and Mr. Martin several times in 2024, gave them a tour of her apartment, and never gave any indication she would be moving out. Sheehan Decl. ¶¶ 2–4, 7, Ex. E. Sheehan also personally observed Ms. Banks' staff and design team preparing plans for only the bottom three floors of the building, not the third and fourth floors. Sheehan Decl. ¶ 5, Ex. E.

[10] "Except as herein expressly set forth, neither Landlord nor any agent or employee of Landlord has made any representation or promise with respect to the Premises or its suitability for Tenant's

43.     Defendants further stated that if Landlord attempted to enforce its rights with a lawsuit, they would publicize their lies to damage Landlord's ability to relet the Premises and refuse to pay any judgment by claiming insolvency.

44.     On August 20, 2025, Landlord sent Defendants a letter explaining that Defendants had defaulted under the Lease, invoking the Lease's acceleration clause, and demanding immediate payment. In response, Defendants sent a letter further evading responsibility and denying clear evidence of their breach. Defendants' counsel also threatened to seek Rule 11 sanctions against Mr. Powell and undersigned counsel if Landlord filed suit against Defendant Banks and Mr. Martin in their personal capacity. To date, Defendants have not cured their contractual defaults.

45.     Landlord now files this suit to enforce the Lease's remedies and hold Defendants Banks and Martin personally liable for their wrongful conduct. Under the terms of the Lease, Landlord is at minimum entitled to immediate payment of: $140,000 in past-due Monthly Minimum Rent for February through October 2025; $2,571,331 in accelerated future Monthly Minimum Rent for the balance of the Initial Term; and a $120,000 letter of credit. (Lease § 4.1, Ex. B at 5; § 19.3(B), Ex. B at 25; § 21.1, Ex. B at 28–29). Thus, Defendants' liability totals no less than $2,831,331 in addition to late fees, accrued interest, Additional Rent, attorneys' fees, and reletting expenses (Lease §§ 7.1, 22.9, Ex. B at 7, 32).

## CAUSES OF ACTION

### I.    Count One: Breach of Contract (Commercial Lease)

46.     Landlord incorporates by reference the foregoing paragraphs.

47.     Defendants breached an enforceable Lease and caused Landlord damages.

---

intended use, and by taking possession of the Premises "as is" and such taking of possession shall be conclusive evidence that the Premises is in good and satisfactory condition at the time of such taking of possession." (Lease § 22.20, Ex. B, at 36).

48.    A party asserting breach of contract must prove: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.

49.    First, the Lease is a valid contract between the Parties. An enforceable contract requires: (1) an agreement to all material terms; and (2) intention of the parties to be bound. Here, the Parties executed the Lease on April 17, 2024. The Parties agreed to all material terms, and it was the intention of the Parties to be bound. There is no legitimate dispute that a valid contract exists, as Defendants rely on the Lease in asserting various defenses to their breach.[11]

50.    Second, Defendants have numerous obligations arising under the Lease.[12]

51.    Third, Defendants breached numerous duties under the Lease. Under the Lease, each of the following constitutes an Event of Default:

(A)    **If Tenant shall fail to pay any Monthly Minimum Rent** or any Additional Rent within five (5) days after the date when the same shall become due and payable, although no demand shall have been made for the same; or

(B)    **If Tenant shall fail to observe or perform any of the covenants, conditions and agreements of this Lease** . . . and such failure shall continue for a period of fifteen (15) days after written notice to Tenant of such failure . . .; or

---

[11] Defendants rely on the Lease to defend their breach, citing §2.1, Article VI, and §22.24 to claim Landlord failed to deliver the entire property, provide required mechanical and plumbing systems, and return their security deposit upon termination (Lease § 2.1, Ex. B, at 3; art. VI, Ex. B, at 7; § 22.24, Ex. B, at 37).

[12] Tenant must pay Monthly Minimum Rent and Additional Rent when due without deduction or setoff. (Lease §§ 4.1–4.3, 7.1, Ex. B, at 5–7.) Tenant must deliver and maintain an irrevocable letter of credit equal to six months' Monthly Minimum Rent for years 1–5 and three months thereafter. (Lease § 21.1, Ex. B, at 28.) Tenant must pay all tax and insurance increases over the 2024 base year and all personal property taxes. (Lease §§ 7.2–7.3, 8.1, Ex. B, at 8–9.) Tenant must arrange and pay for all utilities. (Lease § 9.1, Ex. B, at 9.) Tenant must maintain required insurance coverages and name Landlord as additional insured. (Lease §§ 13.2, 15.2, Ex. B, at 16–19.) Tenant must remit the $60,000 security deposit. (Lease § 22.24, Ex. B, at 37.) Tenant must pay late charges, interest, attorneys' fees, and other Additional Rent. (Lease §§ 4.3, 7.1, 19.3, 22.9, Ex. B, at 6–7, 25–31.) Tenant must provide a $120,000 Letter of Credit to Landlord. (Lease § 19.3(B), Ex. B, at 25).

(D) **If Tenant . . . vacates, abandons, or ceases to carry on its ordinary activities or fails to continuously operate its business in the Premises prior to the Lease expiration date, with or without an intention to pay Rent** . . .; or

(E) **If Tenant . . . shall** . . . become insolvent or . . . **admit in writing its inability to pay its debts generally as they become due** . . .

(Lease § 19.1(A)–(B), (D)–(E), Ex. B, at 23–24) (emphasis added).

52.    In this case, Defendant Tenant has committed Events of Default by failing to pay any rent, vacating and abandoning the Premises, admitting in writing its inability to pay its debts, and generally failing to perform the conditions of the Lease.

53.    Fourth, Plaintiff has suffered extensive damages due to Defendants' breach. The Lease enumerates a non-exhaustive list of remedies to which Landlord is entitled due to Defendants' breach[13], including an acceleration clause providing Defendants are required to pay all rent through the end of the lease term. (Lease § 19.3(B), Ex. B at 26).

54.    Therefore, Defendants are liable for all damages caused by their breach.

**II.    Count Two: Anticipatory Repudiation (Anticipatory Breach of Contract)**

55.    Landlord incorporates by reference the foregoing paragraphs.

56.    Defendants anticipatorily repudiated the Lease.

57.    To prevail on a claim of anticipatory repudiation a party must demonstrate:  (1) the contract remained executory and bilateral at the time of the alleged repudiation; (2) the defendant unequivocally and positively manifested, through words or conduct, an intent to forgo all

---

[13] According to Article XIX of the Lease, the landlord's remedies following a tenant default include: (1) making payments or performing acts on the tenant's behalf and treating the cost as Additional Rent; (2) terminating the lease; (3) re-entering, repossessing, and reletting the premises; (4) recovering damages and expenses from the tenant for the unexpired term; (5) seeking liquidated damages equal to all rent payable through the end of the term minus the fair-market rental value (the acceleration clause); (6) obtaining a lien and right of distress for rent; (7) requiring the tenant to waive certain notices and rights; and (8) preserving the landlord's ability to pursue other remedies. (Lease §§ 19.2(A)–(C), 19.3(A)–(B), 19.4–19.6, Ex. B, at 24–27).

remaining contractual duties; (3) that refusal was unconditional, not a mere negotiation or partial breach; and (4) the plaintiff elected to treat the repudiation as an immediate breach rather than waiting for the time of performance.

58.    First, the Lease is an enforceable contract which remained executory and bilateral at the time of Defendants' repudiation.

59.    Second, Defendants unequivocally manifested their intent not to perform on September 9, 2024, by stating they unilaterally terminated and rescinded the Lease in its entirety.

60.    Third, Defendants' refusal was an unconditional and total breach.

61.    Fourth, Landlord elects to treat this repudiation as an immediate breach.

62.    Therefore, Defendants have anticipatorily repudiated the Lease.

### III.    Count Three: Breach of the Implied Covenant of Good Faith and Fair Dealing

63.    Landlord incorporates by reference the foregoing paragraphs.

64.    Defendants have breached the implied covenant of good faith and fair dealing.

65.    To recover under a claim for breach of the implied duty of good faith and fair dealing, a party must show: (1) a binding and enforceable contract between the parties; (2) Defendant's bad faith conduct; (3) destruction of Landlord's right to the fruits of the contract; (4) causation; and (5) damages.

66.    First, the Lease is a binding and enforceable contract between the Parties.

67.    Second, Defendants acted in egregious bad faith throughout the events at issue, including but not limited to: (1) abruptly abandoning the Premises without cause after occupying the Premises for over two months; (2) attempting to unilaterally terminate the Lease without cause; (3) falsely claiming that Landlord materially breached the Lease to excuse their own breach and nonperformance; (4) concocting deficiencies in the Premises in an attempt to justify their sudden

abandonment of the Premises; (5) failing to notify Landlord of alleged deficiencies in the Premises before repudiating the Lease; (6) stating an intention to undercapitalize Defendant Tenant to evade payment; and (7) threatening to publicly disparage the Building if Landlord filed suit.

68.  Third, Defendants destroyed Landlord's right to the fruits of the contract.

69.  Fourth, Defendants' bad faith destroyed Landlord's rights to the contract's benefits.

70.  Fifth, Landlord has suffered damages due to Defendants' breach.

71.  Thus, Defendants breached the implied covenant of good faith and fair dealing.

## IV.    Count Four: Piercing the Corporate Veil / Alter Ego Liability (Against Defendants Banks and Martin)

72.  Landlord incorporates by reference the foregoing paragraphs.

73.  Defendants Banks and Martin exercised such complete domination and control over Defendant Tenant, and so misused that control, that equity requires piercing the corporate veil and holding them each personally liable under the Lease.

74.  A party seeking to pierce the corporate veil and disregard the corporate entity must prove: (1) unity of ownership and interest between the corporation and the individual defendants; and (2) use of the corporate form to perpetuate fraud or wrong, or in such a manner that adherence to the corporate fiction would sanction a fraud or promote injustice.

75.  First, there is unity of ownership and interest between Defendant Tenant and Defendants Banks and Martin. Defendants Banks and Martin personally negotiated the Lease, orchestrated the venture, and directed the project. Upon information and belief, Defendants Banks and Martin own and dominate Defendant Tenant, which was grossly undercapitalized at the time of its formation. Based on the facts presently known, Landlord reasonably expects discovery will yield evidence demonstrating that Defendants Banks and Martin used Defendant Tenant as a mere alter ego, lacking autonomy and separateness.

76.     Second, as described herein, Defendants Banks and Martin are attempting to use the corporate form to perpetrate wrong. Upon information and belief, Defendant Banks and Martin formed Defendant Tenant to conduct business in the District, undercapitalized the company, and are now using that intentional undercapitalization to justify evading their legal responsibilities.

77.     Also, adherence to the corporate fiction would promote injustice by sanctioning Defendant Banks and Martin's nefarious conduct and leaving Landlord with the entire financial burden in this case, despite no wrongdoing on its part.

78.     Therefore, Defendants Banks and Martin so dominated and misused the Tenant entity that equity requires disregarding the corporate form.

### V.     Count Five: Unjust Enrichment (Pleaded in the Alternative)

79.     Landlord incorporates by reference the foregoing paragraphs.

80.     Defendants have been unjustly enriched at Landlord's expense.

81.     To the extent required by law, this cause of action is alleged in the alternative to Counts One and Two, as permitted under Fed. R. Civ. P. 8(d)(2).

82.     To prevail under a claim of quantum meruit, a party must show: (1) valuable services rendered by the plaintiff; (2) for the person from whom recovery is sought; (3) which services were accepted and enjoyed by that person; and (4) under circumstances which reasonably notified the person that the plaintiff, in performing such services, expected to be paid.

83.     First, valuable services were rendered by Landlord.

84.     Second, Landlord rendered valuable services for Defendants.

85.     Third, the services were accepted and enjoyed by Tenant.

86.     Fourth, under these circumstances Defendants were reasonably notified that Landlord, in performing such services, expected to be paid.

87.     Therefore, Defendants have been unjustly enriched at Landlord's expense and Landlord is entitled to the fair value of benefits conferred.

**VI.     Count Six: Declaratory Judgment (28 U.S.C. § 2201)**

88.     Landlord incorporates by reference the foregoing paragraphs.

89.     Landlord seeks declaratory judgment under 28 U.S.C. § 2201 (2018).

90.     An actual case or controversy exists within the jurisdiction of this Court regarding the Parties' rights and obligations under the Lease.

91.     Accordingly, Landlord seeks a declaratory judgment under 28 U.S.C. § 2201 (2018) that: (1) the Lease is valid and enforceable; (2) Defendants materially breached the Lease by failing to pay any rent, abandoning the Premises, admitting in writing Defendant Tenant's inability to pay its debts, and generally failing to perform the conditions of the Lease; (3) Landlord has not materially breached the Lease; (4) Defendants anticipatorily repudiated the Lease; (5) Defendants breached the implied covenant of good faith and fair dealing; and (6) Defendants Banks and Martin are personally liable as alter egos of Defendant Tenant.

**PRAYER FOR RELIEF**

WHEREFORE, Landlord respectfully prays that this Court enter judgment against Defendants for the following:

92.     A declaratory judgment pursuant to 28 U.S.C. § 2201 (2018) that: (1) the Lease is valid and enforceable; (2) Defendants materially breached the Lease by failing to pay any rent, abandoning the Premises, admitting in writing Defendant Tenant's inability to pay its debts, and generally failing to perform the conditions of the Lease; (3) Landlord has not materially breached the Lease; (4) Defendants anticipatorily repudiated the Lease; (5) Defendants breached the implied

covenant of good faith and fair dealing; and (6) Defendants Banks and Martin are personally liable as alter egos of Defendant Tenant.

93.     Compensatory damages in an amount not less than $2,831,331.

94.     Equitable relief piercing the corporate veil of Defendant School of Smize LLC and imposing alter ego liability against Defendants Banks and Martin, jointly and severally.

95.     Unjust enrichment in the alternative to contractual damages.

96.     Pre- and post-judgment interest as allowed by law.

97.     Reasonable attorneys' fees, expenses, and costs, as provided under the Lease and applicable law.

98.     Such other and further relief as the Court deems just and proper.

Dated: October 9, 2025                    Respectfully submitted,


/s/ *Arziki Adamu*
Arziki Adamu (D.C. Bar No. 1738362)
Arziki Law
5731 6th St. NE
Washington, D.C. 20011
arziki@arzikilaw.com
*Counsel for Plaintiff 218 7th Street SE LLC*